IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KEVIN BUTTERWORTH, | * | |
| Plaintiff, | * | |
| v. | * | Civ. No. DLB-15-1721 |
| PRINCE GEORGE'S COUNTY, MARYLAND, | * | |
| | * | |
| Defendant. | | |

**MEMORANDUM OPINION**

Following the termination of his employment with the Prince George's County Police Department ("PGCPD"), Kevin Butterworth filed suit against Prince George's County ("the County") and two of his former superior officers, Clarence Black and Jason Fisher, pursuant to 42 U.S.C. § 1983. ECF 1. In his complaint, he claimed that the defendants violated his First Amendment rights by retaliating against him for complaining about the conduct of a fellow police officer and, with respect to the County, through deficient whistleblower protection policies. *Id.* This Court previously dismissed without prejudice the claims against Black and Fisher because Butterworth had failed to serve them with the summons and complaint. ECF 35. Now pending is the County's Motion for Summary Judgment. ECF 61. The motion is fully briefed. ECF 72 & 73. No hearing is necessary. *See* Loc. R. 105.6. For the following reasons, the County's motion is granted.

I. **Background**

Unless otherwise stated, the following facts are undisputed. Kevin Butterworth was employed as a police officer with the PGCPD from August 2010 until April 2015. ECF 72-1, ¶ 5. Between May 2011 and June 2014, he was assigned to District 4, Oxon Hill Station, as a patrol

officer. *Id.* ¶ 18. During this assignment, he was a member of a squad of approximately ten officers who were supervised by a corporal and a sergeant. *Id.* ¶ 19. From 2012 through 2014, he consistently earned "Exceeds Satisfactory" on his annual performance evaluations and received several performance awards. *Id.* ¶ 22; *see, e.g.*, ECF 72-4.

Shortly before 2:00 a.m. on November 21, 2013, PGCPD Officer Thomas Creek responded to reports of a suspicious occupied vehicle at an address in Temple Hills. ECF 65-1, at 10. At the address, Creek found two individuals sitting in a vehicle. *Id.* He asked both individuals for their identifications. *Id.* One of the men, Justin Speed, ran into the house. *Id.* Creek, uncertain what Speed was doing inside the house, called for backup and, to indicate urgency, requested responding officers "step it up." *Id.* Speed returned from the house with his mother, Sharon Speed, who confirmed that Speed lived at the address. *Id.* Butterworth was the first additional officer who responded to the scene. *Id.* Creek told Butterworth that Speed was under arrest. *Id.* As Butterworth approached Speed to handcuff him, Speed "actively and aggressively resisted arrest" and struck Butterworth. *Id.* During the ensuing fight, Sharon Speed "interfered with the arrest by grabbing Officer Butterworth from behind and demanding to know why her son was under arrest." *Id.* at 11. Butterworth struck Sharon Speed several times on her left arm, shoulder, and upper torso with an extended baton and ordered her to back up. *Id.* Additional officers arrived and helped control the scene. *Id.* Butterworth returned to Sharon Speed to arrest her, and witnesses later reported that he struck her again. *Id.*

Acting Sergeant Clarence Black, Butterworth's supervisor, prepared a Use of Force Report in which he concluded that Butterworth used excessive force against Sharon Speed. ECF 62-1, at 5–7; ECF 62, ¶¶ 3–7. The Speeds and the other occupant of the vehicle filed complaints with the PGCPD's Internal Affairs Division ("IAD") against Butterworth, Creek, and another responding

officer. ECF 63, ¶ 7; ECF 63-1; ECF 63-2; ECF 63-3. Sergeant Nicholas Zook, an IAD investigator, was assigned to the matter. ECF 63, ¶ 3. Zook's investigation involved interviews with the complainants, the accused officers, and other witnesses in January 2014, as well as a review of a video recording of the incident. *Id.* ¶¶ 3–4; ECF 63-4. The final Report of Investigation was completed on July 4, 2014 and recommended that Butterworth be charged with excessive force. ECF 63-4.

On April 13, 15, and 16, 2014, midway between the excessive force incident and the conclusion of Zook's investigation, Butterworth sent to Corporal Kyle Bodenhorn, a member of IAD, several texts, emails, and a draft anonymous complaint letter about Black. ECF 66-3, ¶¶ 4–8. The complaint letter concerned alleged "incidents involving officer misconduct," including an unauthorized and unnecessary public strip search conducted by Black, orders from Black to perform unnecessary and unauthorized searches during traffic stops and suspicious person stops, and the unnecessary seizure of weapons by Black during home searches. ECF 66-4, at 11. Butterworth alleged that Black was trying to boost "stats" and that other members of the squad were bothered by his behavior but refused to complain due to beliefs that leadership would be unreceptive and a fear of potential retaliation. *Id.* Bodenhorn, who did not know Butterworth, advised him about how to submit his complaint to IAD or a superior officer and what to do if he believed he was suffering "negative repercussions" related to the complaint. *Id.* at 4–5, 7–8; ECF 66-3, ¶¶ 8, 10. After advising Butterworth, Bodenhorn informed only Sergeant David Levin, Black's supervisor, about the conversation. ECF 66-3, ¶¶ 11–14. He told Levin that he had advised Butterworth to file a formal complaint with IAD or with Levin directly. *Id.* ¶ 14. He did not provide Levin with details about the complaint. *Id.* ¶ 15. On April 23, Bodenhorn informed Butterworth that IAD would not be opening a case based on the informal complaint, that Levin

3

assured him he would "handle it appropriately and not disclose [their] conversation," that he (Bodenhorn) could not himself open the case, and that Butterworth still could send something to IAD to get the ball rolling but should not mention Bodenhorn so as to protect his "reputation and standing" in IAD and avoid the appearance of bias.  ECF 66-4, at 7–9; ECF 72-1, ¶ 33.

Butterworth did not file the complaint with IAD.  ECF 66-3, ¶ 17.  Levin testified via affidavit that Butterworth also did not contact him.  ECF 65-5, ¶¶ 8–11.  Nonetheless, after Butterworth reached out to Bodenhorn, his peers began harassing him.  During his April 23 text conversation with Bodenhorn, Butterworth mentioned rumors that he had "opened a case up" on Black.  ECF 66-4, at 9.  Butterworth states in his affidavit that members of his squad began calling him "snitch" and "rat," and that several of them asked why he had opened an internal affairs case against Black.  ECF 72-1, ¶¶ 35–39.  He heard rumors that Black told squad members not to respond if Butterworth called for backup.  *Id.* ¶ 40.  At some point, Butterworth approached Sergeant John White about his concerns for his safety and his desire to get away from Black, even if it meant transferring out of his squad, but White did not take any action.  *Id.* ¶¶ 43–44.  Butterworth also approached Levin about his concerns and his desire to be transferred.  *Id.* ¶ 45.  Levin did not mention Butterworth's complaint about Black during this conversation, and he arranged for Butterworth to meet with White and Acting Captain Jason Fisher.  *Id.*

On April 29, Butterworth met in person with Fisher and White.  ECF 66-7.  A same-day email from White to Fisher, with Levin copied, memorializes that meeting.  *Id.*  White stated in the email that Butterworth appeared "very tense and uncomfortable answering questions" and that he "refused to go into detail behind the cause of his stress."  *Id.*  Butterworth stated that he could not trust his squad and that he did not trust White because he did not know him.  *Id.*  He seemed to think his "safety was in jeopardy, but he could not provide a reasonable explanation" as to why.

4

*Id.* Butterworth requested a transfer several times, growing agitated, and White perceived that he had problems getting along with his squad and another officer named Brooks in particular. *Id.* Butterworth allegedly stated, "if Brooks continues to talk to me, I'm gonna approach him face to face, and whatever happens from there happens." *Id.* In the email, White noted several incidents he had observed during his "short tenure" as Butterworth's supervisor, including Butterworth reporting to duty in uniform without a service weapon the day prior to the meeting, signing court summons late, having low productivity, and having difficulty getting along with other squad members. *Id.* White strongly recommended transferring Butterworth. *Id.* Fisher also prepared a memorandum regarding the meeting, dated May 5; his account generally is consistent with White's, with a few additional details. ECF 66-9. In Fisher's account, Butterworth stated that he did not feel that his squad would back him up and he did not feel comfortable backing his squad up if they requested assistance. *Id.* Fisher perceived that Butterworth was "on the verge of a mental and/or physical breakdown and [wa]s a safety risk to himself, other officers and/or the public." *Id.* Regarding the April 29 meeting, Butterworth states only that Fisher and White dismissed his concerns about his safety but agreed to recommend his transfer to another district. ECF 72-1, ¶ 46.

On May 6, Fisher suspended Butterworth with pay, placed him on administrative leave, and referred him to the Psychological Services Division for evaluation. ECF 66-10; ECF 66-11. Fisher justified the suspension and referral as a result of his meeting with Butterworth and his perception that he was a safety risk. ECF 66-6, ¶¶ 11–13. Following the suspension, Butterworth met with Joe Rollo, the director of psychological services, on May 9 and May 12. ECF 72-1, ¶ 50; ECF 66-12, at 2. Rollo wrote a memorandum to Major Douglas Garrett, the District 4 commander, that stated Butterworth reported "significant problems in his work station, much of it stemming

from conflict with non-sergeant supervisors." ECF 66-12, at 2.  The conflicts "apparently led to a stated inability to work with certain members of the squad" and the request for a transfer.  *Id.*  Rollo speculated that Butterworth was "disenchanted" with his work due to his prior experience in the military, which Butterworth perceived as more prestigious.  *Id.*  In his summary and recommendation, Rollo reported that Butterworth appeared "thoughtful in his responses and demonstrated no significant psychological impairment" and that he did not present any indication of being a threat to himself or others.  *Id.* at 3.  However, his "demeanor and open dissatisfaction with his current patrol duties" were "a matter of significant concern."  *Id.*  Rollo concluded that Butterworth's attitude had the potential to impact his squad's ability to work effectively and safely, but that it was not a product of a psychological disorder and that Butterworth likely would not adjust or successfully integrate.  *Id.*  He recommended a review of the recent excessive force complaint against Butterworth, a possible reassignment to another squad, district, or Bureau, and a follow-up in 60 days.  *Id.*

On June 1, Fisher transferred Butterworth from District 4 to District 6, Laurel/Beltsville Station.  ECF 66-13; ECF 72-1, ¶ 52.  Fisher states that he was not aware at that time of Butterworth's complaints about Black.  ECF 66-6, ¶¶ 21–25.  On July 18, the District 6 commander, Major Kara Lloyd, suspended Butterworth and referred him for psychological evaluation a second time.  ECF 71-2, at 6; ECF 71-4; ECF 72-1, ¶¶ 54, 56.  Lloyd also placed him on administrative duty and assigned him to the Telephone Reporting Unit, which Butterworth describes as the unit "where police officers facing serious disciplinary action are assigned until a final determination is made."  ECF 71-3; ECF 72-1, ¶¶ 57–58.  Lloyd states that the disciplinary actions were the result of a series of incidents in which Butterworth was insubordinate to a superior.  ECF 71-1, ¶ 6.  A contemporaneous memorandum by Lloyd explains that, during a July

6

10 call responding to the alleged rape of a minor, there was a misunderstanding where some officers mistook the victim's brother for the suspect. ECF 71-2, at 2–3. Butterworth grabbed the brother from behind, and they fell to the ground. *Id.* at 3. Butterworth wanted to charge the brother with seven offenses, but the ranking officer on the scene disagreed and ordered a criminal citation and release. *Id.* Butterworth made a dismissive remark to other officers after the ranking officer left, and a sergeant warned him to follow orders and not make inappropriate comments. *Id.* Butterworth proceeded to argue with the sergeant and, in a subsequent meeting, tried to debate the ranking officer about her decision, citing his experience in the military and stating he was more capable than she was. *Id.* at 4. He continued to argue and debate during several additional meetings with other superior officers, despite warnings. *Id.* at 4–6. The record does not contain any information about what happened after the second suspension and referral. Lloyd, like Fisher, states that she was not aware of Butterworth's complaints when she made the decision to suspend him and refer him to psychological services. ECF 71-1, ¶ 13.

On August 29, 2014, Chief of Police Marc Magaw responded to Zook's Report of Investigation concerning the November 2013 incident with Sharon Speed by charging Butterworth with several counts of excessive force and proposing termination as the appropriate disciplinary action for each of the charges. ECF 65-7. Magaw ordered an Administrative Hearing Board to consider the charges, as required by Maryland law. *Id.* at 5. The Board convened on March 4, 2015. ECF 65-1. The members of the Board were Irene Banks, chair; Marc Alexander, co-chair; and Jarrod Salvestrini, an officer of equal rank. ECF 65-1, at 7; ECF 65; ECF 65-2; ECF 65-3. Each states that he or she was not aware of Butterworth's complaints against Black and that their decisions were based entirely on the evidence and testimony presented to them. ECF 65, ¶¶ 10–14; ECF 65-2, ¶¶ 13–14; ECF 65-3, ¶¶ 13–14, 16, 19. The Board voted unanimously to find

Butterworth guilty of Charge 1 – Use of Force, concluding that he used unjustified force when he struck Sharon Speed with his baton. ECF 65-1, at 11; ECF 65, ¶ 6. A character hearing took place before the same Board on March 18 to determine the appropriate recommendation of discipline. ECF 65-1, at 12. After considering witness testimony and Butterworth's personnel file, the Board determined that Butterworth's "egregious act of using excessive force, past work performance, behavior, and discipline" merited a recommendation of termination. *Id.* The Board communicated its conclusions and recommendation to Magaw in a March 24 memorandum. *Id.* at 4. On April 6, Magaw concurred with the Board's conclusion regarding Charge 1 and fired Butterworth. ECF 65-8. Magaw states that he, too, was unaware of Butterworth's complaints against Black when he made his final decision. ECF 65-4, ¶¶ 8–11, 27–28.

On April 28, 2015, Butterworth petitioned for judicial review of his termination. ECF 66. The Circuit Court for Prince George's County affirmed the Board's decision on November 5, 2015. ECF 66-1. The record submitted by the parties does not provide a complete picture of the subsequent procedural history, so the Court takes judicial notice of the relevant docket filings. Butterworth appealed to the Appellate Court of Maryland (at that time named the Maryland Court of Special Appeals) on December 2, 2015. *See* Docket, *Butterworth v. Prince George's Cnty. Police Dep't Admin. Hearing Bd.*, No. CAL16-13629 (Cir. Court. Prince George's Cnty., Md.), https://casesearch.courts.state.md.us/casesearch/inquiry-index.jsp. On May 16, 2017, the Appellate Court vacated and remanded with instructions to the Circuit Court to remand to PGCPD, which the Circuit Court did on October 13, 2017. *Id.* The Appellate Court held in an unpublished opinion that the evidence generally was legally sufficient to sustain the Board's findings and ultimate recommendation, but the Board needed to clarify one factual finding that was contrary to the evidence. ECF 36 (status report with opinion attached). On remand, the Board reissued its

recommendation with revised findings. ECF 39. Butterworth again petitioned for judicial review on March 23, 2018. ECF 66-2 (Docket Report in Circuit Court for Prince George's County civil case no. CAL18-08737). The Circuit Court denied the petition on December 31, 2018, and the Appellate Court affirmed on November 4, 2020. *Id.* at 6.

Butterworth filed suit in this Court on June 19, 2015. ECF 1. The County filed its answer on July 28. ECF 4. Responding to a subsequently filed motion to dismiss, this Court stayed the case pending the completion of the state court litigation appealing the Board's recommendation to terminate Butterworth. ECF 33. This Court also directed Butterworth to show cause why his claims against Black and Fisher should not be dismissed for failure to effect service. *Id.* Butterworth did not respond, and the claims against Black and Fisher were dismissed without prejudice. ECF 35. The stay was lifted on April 30, 2021, following the conclusion of the state court litigation. ECF 59. The County subsequently moved for summary judgment. ECF 61.

**II.     Standard of Review**

Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The Court must "view the evidence in the light most favorable to the nonmoving party" and avoid "weigh[ing] the evidence or mak[ing] credibility determinations." *Lee v. Town of Seaboard*, 863

F.3d 323, 327 (4th Cir. 2017) (quoting *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015)) (internal quotation marks omitted).  However, the Court also must abide by its "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial."  *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)) (internal quotation marks omitted).

If the moving party demonstrates "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmoving party to "present specific facts showing that there is a genuine issue for trial." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015).  A factual dispute is genuine only where there is sufficient evidence to permit a reasonable jury to find in the nonmoving party's favor.  *Id.*; *see also Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019).  "To create a genuine issue for trial, 'the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.'" *Humphreys & Partners Architects*, 790 F.3d at 540 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)).

### III.  Discussion

"To recover damages under 42 U.S.C. § 1983, a plaintiff must show (1) 'the conduct complained of was committed by a person acting under color of state law,' and (2) this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States."  *Martin v. Duffy*, 977 F.3d 294, 298–99 (4th Cir. 2020) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)).  A municipality is considered a "person" for purposes of § 1983, but "a municipality cannot be held liable *solely* because it employs a tortfeasor"; rather, "it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983."  *Hunter v. Town of Mocksville*, 897 F.3d 538, 553–54

(4th Cir. 2018) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). Butterworth claims the County violated his First Amendment rights by retaliating against him for complaining about Black's alleged misconduct and by failing to take steps to prevent retaliation, such as the provision of training and the implementation of written policies to protect whistleblowers.

The First Amendment provides: "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. Const. amend. I. "The First Amendment right of free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). Courts long have held that public employees like Butterworth "do not 'relinquish First Amendment rights to comment on matters of public interest by virtue of government employment.'" *Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 341 (4th Cir. 2017) (quoting *Connick v. Myers*, 461 U.S. 138, 140 (1983)). Indeed, "[p]rotection of the public interest in having debate on matters of public importance is at the heart of the First Amendment[,]" and public employees are likely to have informed views on the operation of their employers. *Id.* (quoting *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998)). Accordingly, courts "do not take lightly '[o]ur responsibility . . . to ensure that citizens are not deprived of fundamental rights by virtue of working for the government.'" *Id.* at 342 (quoting *Connick*, 461 U.S. at 147). However, courts also must consider the countervailing public interest in the efficient functioning of government offices, and "a public employee 'by necessity must accept certain limitations on his or her freedom.'" *Id.* (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).

To balance these considerations, the Fourth Circuit has held that a public employee claiming First Amendment retaliation must establish that (1) he "was speaking as a citizen upon a matter of public concern" rather than "as an employee about a matter of personal interests"; (2) his

"interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public"; and (3) his "speech was a substantial factor in the employer's decision to take action against him." *Smith v. Gilchrist*, 749 F.3d 302, 308 (4th Cir. 2014) (quoting *McVey*, 157 F.3d at 277–78); *see also Grutzmacher*, 851 F.3d at 342.[1]

The County does not dispute that Butterworth suffered adverse actions after he shared his complaints about Black. It argues that he cannot prove that he spoke as a citizen on a matter of public concern or that his speech caused the adverse actions he suffered. The Court agrees. Even when viewed in the light most favorable to Butterworth as the non-movant, the record does not contain any genuine disputes of material fact that he spoke as an employee and that his speech did not cause the adverse actions he suffered. Because Butterworth has not met his burden on those elements, the Court need not address the County's argument that Butterworth has not identified any policy or practice giving rise to municipal liability under § 1983.

## A. Nature of the Speech

In the County's view, Butterworth's speech—his complaint letter and related communications—neither addressed a matter of public concern nor was made in his capacity as a private citizen. To determine whether speech addresses a matter of public concern, courts "examine the content, context, and form of the speech at issue in light of the entire record." *Grutzmacher*, 851 F.3d at 342–43 (quoting *Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000) (en banc)). "Speech involves a matter of public concern when it involves an issue of social,

---

[1] The parties address these requirements within the framework of the more general test for First Amendment retaliation applicable outside the public employment context, which requires a plaintiff to demonstrate that "(1) [he] engaged in protected First Amendment activity, (2) the defendant[] took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendant['s] conduct." *Davison v. Rose*, 19 F.4th 626, 636 (4th Cir. 2021) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005)).

political, or other interest to a community." *Id.* at 343 (quoting *Urofsky*, 216 F.3d at 406). Conversely, speech "upon matters only of personal interest," such as complaints about conditions of employment or interpersonal grievances, is not afforded constitutional protection. *Id.* (quoting *Connick*, 461 U.S. at 147). "When 'a single expression of speech' encompasses both matters of public concern and matters of purely personal interest, 'the proper approach is to consider [the speech] . . . in its entirety.'" *Id.* at 344 (quoting *Stroman v. Colleton Cnty. Sch. Dist.*, 981 F.2d 152, 157 (4th Cir. 1992)). At bottom, the question is whether it appears, "in the exercise of common sense," that a member of the community truly would be concerned with the employee's speech as a whole. *Id.* at 343 (quoting *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 352–53 (4th Cir. 2000)).

In *Grutzmacher*, the Fourth Circuit held that only some of a public employee's activities on Facebook addressed matters of public concern and merited First Amendment protection. *Id.* The plaintiff, a firefighter battalion chief, had been fired following a series of Facebook posts, likes, and comments. *Id.* at 340. Specifically, he posted that it was an "outstanding idea" and would be "poetic" and satisfying to "beat[] a liberal to death with another liberal" in order to get liberals "outlawed" like guns; he liked and expressed approval towards a reply comment suggesting the use of "a fat one" as "high capacity" or "a black one" as "more 'scary'"; he posted criticism of the fire department's order for him to remove the post, suggesting his superiors were part of the "liberal socialist agenda"; and he liked a photo posted by another public employee, entitled "for you Chief," that depicted an elderly woman with her middle finger raised and stated "I'LL POST WHATEVER THE F*** I WANT[.]" *Id.* at 338–39. The Fourth Circuit held that the first post and the reply activity were commentary on gun control legislation, an issue that courts long have recognized as a matter of public concern. *Id.* at 343. Likewise, the plaintiff's criticism

13

of the fire department's social media policy and the order to remove the posts were protected because the public "has an interest in information about policies that circumscribe public employees' speech and . . . opinions of such policies." *Id.* at 344. Conversely, the plaintiff's "like" of the image directed at the fire chief "amounted to no more than an employee grievance not protected by the First Amendment." *Id.* (quoting *Stroman*, 981 F.2d at 156).

The County characterizes Butterworth's letter as addressing only "internal issues about conditions of employment." ECF 61-2, at 12. The complaint letter flatly contradicts this characterization. Under the umbrella of "internal issues," the County would shove Butterworth's allegations that Black ordered other officers to perform, and on at least one occasion himself performed, unauthorized and illegal searches in "violation of individual rights." ECF 66-4, at 11. Black allegedly would arrive at traffic stops and suspicious person stops and "demand" unauthorized searches, such as telling officers to empty everything out of a person's pockets, in an effort "to produce stats." *Id.* For the same reason, he would seize guns during home searches whenever he could, regardless of need or legality. Butterworth believed such practices were wrong and he feared that, if they continued, they would give PGCPD a "horrible reputation" and "make its relationship with its own community more difficult." *Id.* These allegations address issues of significant political and practical interest to the local community—the role of police, the value of "stats" within PGCPD and the incentives they create, potential violations of citizens' rights, and the relationship between PGCPD and the community itself. To be sure, Butterworth also touches on the effects on Black's alleged misconduct on him and his squad, and his letter was addressed internally rather than to the public. But when viewed in its entirety and through the lens of common sense, as the Court must view it, Butterworth's letter clearly addresses matters of public concern. *See Billioni v. Bryant*, 759 F. App'x 144, 150 (4th Cir. 2019) (unpublished) (holding a

14

public employee's "allegations of misconduct" against other public employees who possibly caused the death of a man in their custody addressed a matter of public concern).

Butterworth's speech still may lack First Amendment protection if he spoke as an employee rather than as a private citizen. In determining whether a public employee spoke as an employee or as a citizen, "the Supreme Court has instructed [courts] to engage in a 'practical' inquiry into the employee's 'daily professional activities' to discern whether the speech at issue occurred in the normal course of those ordinary duties." *Hunter v. Town of Mocksville*, 789 F.3d 389, 397 (4th Cir. 2015) (quoting *Garcetti*, 547 U.S. at 422, 424). "The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 239 (2014). For example, testimony in a judicial proceeding that merely includes information learned during the course of a public employee's work is protected. *Id.* An internal memorandum prepared by a government attorney "pursuant to his duties as a prosecutor[,]" on the other hand, is not protected speech because it is what the attorney "was employed to do." *Garcetti*, 547 U.S. at 421.

Butterworth spoke as an employee, not as a private citizen, when he shared his concerns about Black. At the time Butterworth shared his concerns, PGCPD's General Orders Manual imposed a duty on officers to report misconduct and abuse. Specifically, Volume I, Chapter 4, Section V, Paragraph 6 of the manual provided: "Any employee who becomes aware of unlawful conduct . . . *shall report* it to the involved employee's Commander/Director. In confidential matters, reports may be made directly to the Director, IAD." ECF 65-6, at 5 (emphasis added). Similarly, PGCPD's Internal Investigation Manual provided that "[a]ny employee[] who becomes aware of unethical [conduct], unlawful conduct, or a violation of written directives[] *shall report* such observations through their chain of command[.]" *Id.* at 9 (emphasis added). These provisions

15

imposed a duty on Butterworth, as an officer and employee of PGCPD, to report conduct that he believed to be unlawful and a violation of citizens' rights. Even if Butterworth did not submit his report to his commander, he testified that he documented and shared his concerns about Black's alleged misconduct because "it was [his] duty as a sworn police officer of Prince George's County to protect and defend the citizens and their rights . . . [when] they're being violated by an officer." ECF 64, at 13 (49:1–18). He submitted his complaint letter to Bodenhorn specifically because Bodenhorn worked at IAD. *Id.* (48:4–5).

This case is similar to *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331 (D. Md. 2011). In that case, this Court granted summary judgment to the City of Baltimore on a First Amendment retaliation claim brought by a former police officer. *Id.* at 355. The officer had lodged a written complaint with Internal Affairs stating that several officers were submitting falsified overtime slips and that several supervisors were complicit in the overtime abuse. *Id.* at 338. Central to this Court's decision to reject the claim was a BPD rule that required officers "to report any acts of misconduct . . . detrimental to the operation of the Department, in accordance with established procedures." *Id.* at 350. Under this rule, the plaintiff "was 'required' to 'report' the misconduct of her fellow officers," and the speech giving rise to her retaliation claim was made pursuant to that duty. *Id.* The Court cited a "virtually indistinguishable" Seventh Circuit case, *Houskins v. Sheahan*, 549 F.3d 480 (7th Cir. 2008), which held that a similar department rule using similar language expressed "a duty that [the plaintiff] was expected to perform" and, therefore, rendered speech made pursuant to that duty unprotected by the First Amendment. *Id.* Here, the presence of a similar rule leads to a similar conclusion that is further supported by Butterworth's own expressed understanding of his official duty to report police misconduct.

The cases Butterworth cites do not support a different outcome. In *Givhan v. Western Line Consolidated School District*, the United States Supreme Court expressed the uncontroversial principle that First Amendment protection is not necessarily "lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." 439 U.S. 410, 415–16 (1979). That case involved a schoolteacher's private complaints to her principal about perceived racially discriminatory policies and practices. *Id.* at 413. It did not involve any official duty on the part of the teacher to make such complaints. *Dahlia v. Rodriguez*, meanwhile, actually supports the County's position. 735 F.3d 1060 (9th Cir. 2013). In that case, the Ninth Circuit held that, "particularly in a highly hierarchical employment setting such as law enforcement, [the question of] whether or not the employee confined his communications to his chain of command is a relevant, if not necessarily dispositive, factor in determining whether he spoke pursuant to his official duties." *Id.* at 1074. So, while "it is not dispositive that a public employee's statements are made internally," it generally is true that "when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job[.]" *Id.* (quoting *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008)). The plaintiff in *Dahlia* alleged that he met with Internal Affairs about the misconduct he alleged, but it was ambiguous at the motion to dismiss stage whether his "professional duties required him" to do so. *Id.* at 1077. The court allowed the claim to proceed because it was required to resolve the ambiguity in the plaintiff's favor. *Id.*

Here, the fully developed record is clear that Butterworth had a duty to report misconduct to IAD as part of his employment. When he reached out to Bodenhorn at IAD and shared his complaint letter, he acted as an employee and not as a private citizen. Butterworth cannot establish the first element of public employee First Amendment retaliation.

## B. Causation

Even if Butterworth had spoken as a private citizen, there is no record evidence that his speech caused the adverse actions he suffered. To establish the requisite causal connection, "a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity." *Constantine*, 411 F.3d at 501 (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).

The County offers uncontroverted evidence, in the form of affidavits, that none of the individuals responsible for the adverse actions Butterworth suffered—from his suspension to his referral to psychological services to his termination—was aware of his complaint about Black. Zook, who conducted the investigation into Butterworth's use of excessive force, stated that he "was not aware of any alleged or anonymous complaints" by Butterworth until this lawsuit and that no such complaints had any bearing on his conclusions or his decision to testify at Butterworth's hearing. ECF 63, ¶¶ 5–6. Burks, the chair of the Administrative Hearing Board in Butterworth's case, stated that she also was unaware of any complaints by Butterworth until this lawsuit, that the Board did not discuss his complaints during its deliberations, and that she would have reached the same conclusions if she had known about his complaints. ECF 65, ¶¶ 10–14. Alexander, the Board's co-chair, and Salvestrini, the officer of equal rank on the Board, testified similarly. ECF 65-2, ¶¶ 13–14, 16, 19; ECF 65-3, ¶¶ 13–14, 16, 19. Fisher, who suspended Butterworth and referred him for psychological evaluation, likewise stated that he was unaware of the complaints against Black until this lawsuit but would have made the same decisions regardless. ECF 66-6, ¶¶ 21–25. Lloyd, who was responsible for Butterworth's second suspension and referral to psychological services, stated the same. ECF 71-1, ¶¶ 12–18. And Magaw stated that he was not aware of the complaints, that he had "never heard any rumors about the filing of such a

18

complaint," and that his decision to terminate Butterworth was based solely on the documents he reviewed and was not retaliatory in any way. ECF 65-4, ¶¶ 8–11, 27–28.[2]

Butterworth does not address causation in his opposition. Nor does he identify the relevant decisionmakers. As for his evidence, he provides his own affidavit stating that, immediately after he shared his complaint with Bodenhorn, members of his squad began harassing him and made comments suggesting that they believed he had filed a complaint against Black with IAD. ECF 72-1, ¶¶ 35–42. Kevin Morris, another former PGCPD officer, similarly testified via affidavit that he had heard "rumors" of retaliation against Butterworth by his peers—"peer-level bullying"—and that he believed Butterworth's "efforts to notify [IAD] . . . had gotten back to officers within the district[.]" ECF 72-7, ¶¶ 20–26. However, Morris also stated that he had transferred out of District 4 and, as a result, his knowledge of the matter was "extremely limited." *Id.* ¶ 25. Somewhat more compelling, Jason Lish, a current PGCPD officer and former member of Butterworth's squad, testified via affidavit that Black and other members of the squad talked with him about Butterworth's complaint, which they believed he had filed with IAD. ECF 72-9, ¶¶ 9–12. But no record evidence suggests any of those individuals, including Black, was involved in the decisions to suspend Butterworth, refer him to psychological services, or terminate his employment.[3] At most, Butterworth's evidence supports the inference that his peers, coworkers,

---

[2] The County also provides an affidavit from Levin, who does not appear to have contributed to any of the relevant personnel actions. Levin states that he previously was unaware that Butterworth had prepared a written complaint about Black, although he had heard that Butterworth and Black had "some issues." ECF 65-5. Finally, Black states in an affidavit that he did not learn about Butterworth's complaints until after Butterworth's termination. ECF 67.

[3] Black's conclusion in the Use of Force Report that Butterworth had used excessive force against Sharon Speed came in November 2013, shortly after the incident and months before Butterworth shared his complaints about Black. ECF 62-1.

and supervisor—none of whom was involved in the personnel decisions he challenges—somehow learned about his speech and that Department leadership viewed him as a "problem child." *See, e.g.*, ECF 72-13, ¶¶ 13–15 (affidavit of officer Jason Ahalt stating that superiors sometimes referred to Butterworth as a "problem child"). There simply is no evidence that any of the relevant decisionmakers—Magaw, Zook, Burks, Alexander, Salvestrini, Fisher, or Lloyd—knew about Butterworth's complaint.

Of course, even if one or more of the relevant decisionmakers were aware of Butterworth's speech, more is required to establish the necessary "but for" causation. *Constantine*, 411 F.3d at 501. But Butterworth does not identify evidence supporting that first critical step, so the analysis need not proceed further.

The County is entitled to judgment as a matter of law on Butterworth's First Amendment retaliation claims.

## IV.    Conclusion

In response to the County's evidence, Butterworth has not presented evidence showing a genuine issue for trial. The County has established that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law. The motion for summary judgment is granted. A separate order follows.

Date: March 3, 2023

Deborah L. Boardman
United States District Judge